UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

AMY TRIPP, Conservator of RRKC, a minor

    Plaintiff,

                          Case No. 2:21-cv-12859-VAR-PTM
                          Hon. Victoria A. Roberts
                          Magistrate Judge Curtis Ivy, Jr.

v

UNITED STATES OF AMERICA,

    Defendant.

---

JULES B. OLSMAN (P28958)
RONDA M. LITTLE (P47236)
ELYSE HEID (P80192)
OLSMAN MacKENZIE PEACOCK & WALLACE, P.C.
Attorneys for Plaintiff
2684 West Eleven Mile Road
Berkley, MI 48072
248-591-2300 / 248-591-2304 [fax]
jbolsman@olsmanlaw.com

---

**FIRST AMENDED COMPLAINT AND AFFIDAVIT OF MERIT**

    NOW COMES the plaintiff AMY TRIPP, Conservator of RRKC, a minor by and through her attorneys, OLSMAN MacKENZIE PEACOCK & WALLACE, PC, and does hereby complain against the defendant UNITED STATES OF AMERICA in a civil action, stating unto this Court as follows:

**NATURE OF THE CASE**

1.    That the minor plaintiff RRKC suffered permanent neurological and physical injuries after medical care providers at Great Lakes Bay Health Centers and/or Great Lakes Bay Health Center Bridgeport (hereinafter referred to as GLBHC) ignored her poor weight gain/failure to thrive and her enlarging head circumference. Medical care providers failed to diagnose and report evidence of child abusive by RRKC's parents, Meghan Sarles and Taylor Cantu. As a direct and proximate result of these acts of professional negligence and/or malpractice, RRKC suffered intracranial bleeding, lacerations to her brain, seizures, retinal hemorrhages, multiple fractures, and permanent neurologic and physical impairments.

## THE PARTIES

### Plaintiff

2.     That the minor plaintiff is a resident and citizen of the City of Davison, County of Genesee, State of Michigan where she lives with her foster parents, Jamie and Paul Taylor.

3.     That the Plaintiff AMY TRIPP  is an attorney licensed to practice law in  the state of Michigan. She is the duly appointed Conservator for the minor plaintif RRKC

4.     That as the Conservator for the minor plaintiff, Amy Tripp, is authorized to pursue all claims and remedies available to the minor plaintiff pursuant to the Federal Torts Claim Act, 22 USC §136 (FRCP 17(c)(1)).

### Defendant

5.     Defendant UNITED STATES OF AMERICA (hereinafter referred to as UNITED STATES) includes the U.S. Department of Health and Human Services, GLBHC, and Eventure Bernardino, M.D.

6.     The U.S. Department of Health and Human Services (DHHS) is an authorized federal agency of defendant the United States of America.

7.     At all times relevant hereto to this Complaint, GLBHC, is a corporation organized under the laws of the State of Michigan, located and conducting business in Saginaw County, Michigan.

8.     At all times pertinent to this Complaint, GLBHC, was a Federally Qualified Health Center pursuant to 42 USC §233(g)(k) operating under the DHHS.

9.     GLBHC, at all times relevant to the allegations of this Complaint, operated a health care facility and held itself out as qualified to provide care and treatment of the general public, including the minor plaintiff.

10.    At all times relevant hereto, GLBHC, held itself out to the public as a medical care facility which employed skilled and competent medical personnel including physicians and other health care providers.

11.    Eventure Bernardino, M.D. (hereinafter referred to as Dr. Bernardino) is a physician licensed to practice medicine in the State of Michigan, who, at all times relevant hereto, was established in Saginaw County, Michigan.

12.    Dr. Bernardino held himself out to the public as a medical physician capable of providing medical care to the public, including newborn children situated as was the minor plaintiff.

2

13.  Dr. Bernardino was at all times relevant hereto, an employee, agent, ostensible agent and/or representative of GLBHC. As a result, the United States is vicariously liable for the professional negligence and/or malpractice committed by him with regard to the minor plaintiff as is set forth herein.

**<u>Jurisdiction and Venue</u>**

14.  The amount in controversy herein exceeds Seventy-Five Thousand ($75,000.00) Dollars.

15.  Plaintiff presented an Administrative Tort Claim (Tort Claim) for medical negligence to the Department of Health and Human Services (DHHS) pursuant to 28 USC §2675(a), along with all relevant medical records via overnight mail, email, and fax on April 6, 2019. (Exhibit 1)(Exhibit 2)(Exhibit 3)(Exhibit 4).

16.  DHHS did acknowledge receipt of the Tort Claim brought on behalf of the minor plaintiff in correspondence dated May 18, 2021(Exhibit 5).

17.  On November 8, 2021, DHHS denied the claims brought on behalf of the minor plaintiff (Exhibit 6).

18.  This Complaint sets forth the cause of action delineated in the Tort Claim submitted to the defendant DHHS on April 6, 2019.

19.  The United States has waived governmental immunity and consented to this lawsuit pursuant to 28 USC §1346(b)(1).

20.  The Court has jurisdiction over the defendant pursuant to 28 USC §1346(b) and/or 28 USC §1331.

21.  Venue is proper in the Eastern District of Michigan as it is the situs of the events giving rise to this action which occurred in Saginaw County, Michigan.

**<u>FACTUAL ALLEGATIONS</u>**

22.  That the minor Plaintiff RRKC was born at Covenant Medical Center in Saginaw, Michigan.

23.  That the minor plaintiff's Apgar scores following birth were 8 out of 10 at one minute, and 9 out of 10 at five minutes.

24.  That the minor plaintiff's birthweight was 3200 grams placing her in the 11th to 25th percentile for a term newborn. Her length (or height) was 52.5 centimeters which was in the 51st to 57th percentile. Similarly, her head circumference was noted to be 36.5 centimeters, which was in the 51st to 75th percentile.

3

25.   That the minor plaintiff had difficulty breathing after birth. She was admitted to the Neonatal Intensive Care Unit (NICU), where she received a noninvasive mask to assist with her breathing.

26.   That at the time of minor plaintiff's birth, her birth mother, Megan Sarles was 19 years of age. This was her first pregnancy and her first child. Megan had a history of autism, bipolar disorder, attention deficit hyperactivity disorder (ADHD), depression and self-harm. Ms. Sarles had been involuntarily admitted to a psychiatric facility in June 2018 for depression. She was noted to smoke, and also tested positive for marijuana during her pregnancy.

27.   The minor plaintiff's father, Taylor Cantu, was 25 years old and noted to have a history of oppositional defiant disorder, bipolar disorder, and schizophrenia.

28.   That on April 9th, it was noted that her weight decreased on her growth chart to the 16.53 percentile. On April 13th, there was another weight loss of 5 grams. By April 14th, she had a weight gain of 60 grams, and her weight had increased to the 17.15 percentile. Hospital providers continued to attempt to educate RRKC's parents on the vital importance of feeding up to the time of her discharge.

29.   The minor plaintiff was being formula fed. Her parents were instructed to feed her every three hours and on demand with cues. Her parents were further instructed to call the doctor if she did not feed well or did not wake up for feedings. The hospital provided information pertaining to Early On Intervention and the Maternal Infant Health Program (MIHP) to her parents.

30.   On April 16, 2019, the minor plaintiff attended her first newborn visit at GLBHC. She was seen by Dr. Bernardino. Her vitals were recorded by Evan Huchinson, RMA. Growth measurements were recorded in the medical record, as follows:

| Vital Signs | |
|---|---|
| Height: | 21 inches |
| Height Percentile: | 84% |
| Weight: | 7.44 lbs |
| Weight Percentile: | 31% |
| Wgt-Stature Percentile: | 1% |
| Head Circumference: | 14 inches |
| Head Circ. Percentile: | 52% |
| BMI: | 11.86 in-lbs |
| BMI Classification: | Underweight |
| Body Surface Area (m2): | 0.11 |

31.   Despite the fact that the minor plaintiff presented as notably underweight, Dr. Bernardino documented, "Infant is doing well – Return in 1 month."

32. On May 21, 2019, Megan Sarles returned to GLBHC with her daughter who was now age 6 weeks, for a well-child check. She was again seen by Dr. Bernardino and her vital signs were again documented by Evan Hutchison, RMA.

33. Growth measurements were recorded as follows:

| Vital Signs | |
|---|---|
| Height: | 22 inches |
| Height Percentile: | 62% |
| Weight: | 7.88 lbs |
| Weight Percentile: | 6% |
| Wgt-Stature Percentile: | 0% |
| Head Circumference: | 15.75 inches |
| Head Circ. Percentile: | 91% |
| BMI: | 11.45 in-lbs |
| BMI Classification: | Underweight |
| Body Surface Area (m2): | 0.12 |

34. That despite the alarming decrease in her weight percentile from 31% to 6%, and a weight-stature percentile of 0% since her visit one month prior, Dr. Bernardino documented as follows:

> Mom is concerned about her weight gain. ...not going to WIC because of transportation problem. ...Did not gain weight that much, discussed with mother proper feeding. Infant has good sucking reflex and eating well. Mother advised to keep feeding her infant. Discussed also proper burping. Mother encouraged to go to WIC.

35. That no mention was made by Dr. Bernardino regarding the minor plaintiff's head circumference, which had increased from 52% a month earlier, to 91%.

36. The following day, May 22, 2019, Evan Hutchison, RMA called the minor plaintiff's parents to schedule a weight-check visit for their daughter. The next week he noted "Please schedule patient for a weight-check visit when call is returned." Mr. Hutchison made the same phone call the following day and left another message for her parents.

37. On May 30, 2019, the minor plaintiff returned to GLBHC for a weight-check visit. She was now eight weeks old. She was noted to be 8 pounds 4 ounces by LaToya Cotton, RMA. Dr. Bernardino was identified as the "Responsible Provider" and signed off on the medical record. Dr. Bernardino failed to do an analysis of percentiles or Body Mass Index (BMI). No such information is recorded in her medical record.

5

38.    On June 10, 2019, GLBHC sent a letter to Megan Sarles informing her that she was a "no-show" for her daughter's appointment on that day.

39.    On June 14, 2019, the minor plaintiff was approximately nine weeks old. She presented for a well child check. Growth measurements were recorded as follows:

| Vital Signs | |
|---|---|
| Height: | 22 inches |
| Height Percentile: | 27% |
| Weight: | 8.94 lbs |
| Weight Percentile: | 6% |
| Wgt-Stature Percentile: | 2% |
| Head Circumference: | 17 inches |
| Head Circ. Percentile: | 99% |
| BMI: | 12.99 in-lbs |
| BMI Classification: | Underweight |
| Body Surface Area (m2): | 0.12 |

40.    On the June 14th visit, the minor plaintiff was still underweight, in the 6th percentile. Her head circumference had again increased from 91% to 99%. This was an alarming finding ignored by Dr. Bernardino.

41.    The minor plaintiff was again seen by Dr. Bernardino on June 14. On physical exam, he noted that the minor plaintiff's general appearance was "weak and malnourished" and that she had "poor skin turgor" a clear marker for dehydration. Dr. Bernardino also noted that RRKC's "...head circumference is above the normal range."

42.    That despite the minor plaintiff's weakened condition, Dr. Bernardino documented that she developmentally responded to voice/bell, and that she had "equal movements" in fine/gross motor skills, and she "follows past midline."

43.    Neurologically the minor plaintiff was noted to have moro, suck, root, grasp and plantar grasp reflexes. Patellar reflexes were noted to be 2+/4 and equal. He also noted that his skeletal exam found no hip click, moves all extremities equally, normal structure, tone and strength, and clavicles were intact."

44.    Dr. Bernardino also noted: "There is slow progression of her weight. Parents claims she eats well 3-4 ounces every 4 hours. Mother did not go to the WIC. Immunization is due." Dr. Bernardino's documented impressions from the June 14th visit, were as follows:

6

**Impression:**
Immunization update (ICD10-Z23), Protein calorie malnutrition (ICD10-E46), Well infant examination (ICD10-Z00.129) - Infant needs referral to matetrnal and infant care. It seems to me that there is poor care on the infant. Parents advised to feed the baby  as much as she wants or feed more  Reassured them they are not overfeeding her , in fact she is very underweight right now. Discussed anticipatory guidance. Immunization updated. - as  cheduled

45. After the minor plaintiff had received her immunizations on June 14, 2019, Dr. Bernardino chose to let her leave with her parents. Her medical plan was documented to address the minor plaintiff's "poor care" and malnutrition and no plan was created for future weight checks.

46. That Dr. Bernardino failed to create a differential diagnosis for the minor plaintiff's abnormally large head circumference, and no medical work-up was ordered to determine the etiology of this abnormality.

47. In reports later made to investigators, Ms. Sarles, minor plaintiff's mother, reported that, on or about June 17, 2019, RRKC's right elbow was bruised and swollen. Ms. Sarles also reported that, on or about June 19, 2019, she heard a "loud thud" downstairs in their home while Mr. Cantu was alone with their daughter.

48. Ms. Sarles reported that on June 23, 2019, her daughter was "hard core napping," and Ms. Sarles needed to change her diaper and bathe her in order to encourage her appetite.

49. Ms. Sarles also reported to investigators that on June 24, 2019, the minor plaintiff was "shaky." She relayed that her own father had epilepsy and she was concerned that the minor plaintiff's shakiness were seizures.

50. Despite Ms. Sarles's requests, Taylor Cantu refused to take his daughter to the hospital. Instead, they drove to Ms. Sarles's mother's home where upon the minor plaintiff again exhibited seizure-like activity.  Only then was she taken to the ER at Covenant Hospital.

51. At 9:06 p.m. on June 24, 2019, the minor plaintiff presented at Covenant Medical Center in Saginaw, Michigan.  She was just over 10 weeks old.

52. At 1:15 a.m on June 25, 2019, Christopher Heberer, M.D. authored a history of present illness, wherein he noted that the "patient's parents state that she had 3 episodes of 'staring off, drooling, and shaking' today."

53. Dr. Heberer performed a physical exam and noted that the minor plaintiff appeared to be listless and cachectic (muscle wasting from stravation). She was noticed to be pale and malnourished. Her anterior fontanelle was full, and macrocephaly was present. The minor plaintiff's mucous membranes were dry, she had an auricular hematoma of the left ear, and exhibited abnormal extraocular motion and nystagmus in both eyes. She had bilateral upper eyelid petechial hemorrhages. Her

right elbow had decreased range of motion, swelling, and obvious deformity. Her right knee had decreased range of motion and swelling.

54.   Dr. Heberer documented his "immediate concern for *nonaccidental trauma*." He ordered a lab workup, a CT scan of the head, and a skeletal survey to further evaluate this newborn child.

55.   That the minor plaintiff's skeletal survey showed evidence of old and calcified right elbow fracture, an old and calcified proximal right tibia fracture, and healing fractures of the 10th and 11th ribs on the left and right. Her head CT revealed evidence of intracranial hemorrhage. The radiologist's impression was nonaccidental trauma/child abuse.

56.   That the minor plaintiff was further observed to suffer additional seizure activity.

57.   That law enforcement and Child Protective Services were contacted based upon suspicion of child abuse.

58.   Megan Sarles related to police investigators that Taylor Cantu had physically struck her in the past, and that she likewise hit him. She also described multiple instances in which she heard Taylor Cantu abusing their daughter:

> "I heard a thud downstairs and stuff, and I went down – she was in his arms crying. He said, "you think I did something." She was crying like she was hurt. I live in an old house. Used to be a coal mine office. I heard, like if you dropped something heavy on the floor and then I heard her crying – it's happened a couple times."

59.   Taylor Cantu claimed that his daughter had "fallen" multiple times.

60.   After one fall, Taylor Cantu stated "her eyes went side to side and then she went back to normal."

61.   Taylor Cantu advised a police officer that his daughter had also fell out of her car seat and that she had rolled off a chair/couch several times.

62.   Mr. Cantu told police that his daughter again rolled off the couch at his parent's house on June 24th, before they came to Covenant Medical Center.

63.   That imaging at Covenant Medical Center revealed that the minro plaintiff had hemorrhaging on both sides of her brain and in both of her eyes.

64.   Providers photographed the minor plaintiff's injuries, documenting visible evidence of bruising, fractures, clear macrocephaly (abnormally large head circumference), and swollen eyelids resulting from traumatic head injury.

65. The minor plaintiff's final diagnoses included traumatic subdural hemorrhage with loss of consciousness, unspecified fracture of lower end of right humerus, unspecified fracture of upper end of right tibia, confirmed child maltreatment, a left ear contusion, unspecified eyelid disorders, spontaneous ecchymoses, unspecified tremor, feeding problem of newborn, cachexia (where muscles waste from starvation), pallor, macrocephaly (abnormally large head), dry mouth, unspecified nystagmus (repititive uncontrolled movements of the eyes), right elbow and right knee effusion (abnormal accumulation of fluid in the joint), multiple fractures of right side ribs, and multiple fractures of left side ribs.

66. On June 25, 2019, the minor plaintiff was evaluated by a pediatric intensivist Dr. Salman and a trauma surgeon Dr. Blank at Covenant Hospital who concluded that due to the severity of her injuries, she should be transferred to the University of Michigan Hospital in Ann Arbor for specialized pediatric care via emergency survival flight that day.

67. Upon her arrival at the University of Michigan Hospital, the minor plaintiff was evaluated by Dr. Bethany Mohr, a pediatrician specializing in child abuse. She authored a thorough child protection team report.

68. Dr. Mohr was further able to elicit additional information from Megan Sarles regarding her baby's home life.

69. Appearing anxious and tearful, Ms. Sarles reported intimate partner violence in her relationship with Mr. Cantu. She was hesitant to relay her daughter's history and details of their living arrangements to Dr. Mohr. She was fearful of how Mr. Cantu would react. Mr. Cantu had previously told Ms. Sarles that he hated her and referred to her using misogynistic phrases. He had also been physicially abusive to her.

70. Ms. Sarles recalled how Mr. Cantu "play[ed] rough" with RRKC, "mess[ed] with her legs and arms," and "pull[ed] on her toes."

71. Ms. Sarles, Mr. Cantu, and the minor plaintiff all previously lived with Mr. Cantu's parents, but were evicted after a property damage incident. The minor plaintiff and her parents then stayed with various friends, including a woman named Tricia who has three children of her own. Ms. Sarles informed Dr. Mohr that the minor plaintiff did not have a crib or bassinet; the minor plaintiff was required to sleep in a carseat.

72. Dr. Mohr's report identified the minor plaintiff's parents' mental health histories. She noted that Ms. Sarles had not followed up on mental health treatment since her June 2018 admission and had stopped taking her medications. Megan Sarles also reported that Taylor Cantu had been diagnosed with oppositional defiant disorder and bipolar disorder. He was also noncompliant with his medications.

73. At the University of Michigan Hospital, the minor plaintiff was confirmed to have had non-accidental traumatic injury, subdural hematoma, retinal hemorrhage of both eyes, and seizures. She was diagnosed with a closed fracture of shaft of right

9

humerus, closed fracture of proximal end of right tibia, and closed fracture of multiple ribs on her right side.

74.   The minor plaintiff was further diagnosed with cerebral salt-wasting syndrome due to her traumatic brain injury. She had anemia due to acute blood loss and aspiration into airway. She was noted to have abnormal renal ultrasound and hyponatremia.

75.   In addition, the minor plaintiff was diagnosed with anisometropia, a condition that occurs when the eyes have varying refractive powers, causing the eyes to focus unevenly.

76.   That due to these multiple diagnoses, minor plaintiff was determined to be medically fragile.

77.   The minor plaintiff underwent a long-term electroencephalogram (EEG) video monitoring study in the pediatric epilepsy lab. That during the recording, there were numerous multifocal subclinical seizures (abnormal brain activity) -- at least one of which was a migratory seizure that began over the left and then migrated to the right. These seizures lasted between 30 to 40 seconds, but could also be as long as two minutes in duration. These findings were consistent with moderate to severe encephalopathy.

78.   That as a result of the admissions of child abuse made by the minor plaintiff's parents, and the examinations performed by medical providers at Covenant Medical Center and the University of Michigan Hospital, Child Protective Services assumed custody of the minor plaintiff.

79.   The minor plaintiff's medical condition at the time of discharge from the University of Michigan Hospital included subdural hematoma; seizure; closed fracture of the shaft of the right humerus; closed fracture of the proximal end of the right tibia; closed fracture of multiple ribs of the right side; retinal hemorrhage of both eyes; anemia due to chronic blood loss; non-accidental traumatic injury to child; cerebral salt-wasting syndrome; anemia due to acute blood loss; and aspiration into airway. The minor plaintiff's discharge summary noted that she would likely suffer significant lasting impairments with regard to functional and cognitive development as well as poor response to visual and auditory stimuli, all secondary to abusive head trauma. She was scheduled to be seen by multiple medical specialists and also required seizure prophylaxis due to neurological trauma.

80.   Taylor Cantu was arrested and charged with first-degree child abuse. Both Taylor Cantu and Megan Sarles were notified as to the likely termination of their parental rights as a result of the injuries inflicted on the minor plaintiff.

81.   Brittany Mohr, M.D. testified on December 12, 2019 at the parental rights termination hearing of Megan Sarles and Taylor Cantu. Dr. Mohr testified as follows:

10

Q. To your knowledge, the primary care physician in June of 2019 did not note any extreme concerns with RRKC, is that correct?

A. So the documentation from June 14 is alarming to me. So I believe in my opinion that the documentation indicates extreme concern but that concern was not acted upon. There was no plan. (Dr. Mohr, p. 60:2-8).

A. ...so again, looking it full picture, so if you have a baby who's weight – so this being – going from the 39th percentile on April 16th to the second percentile on 6/14 is a medical emergency. So gold standard would be that this baby would be admitted to the hospital directly from – or at least that day from the pediatrician's office. And then if you look at the examination, so based on the documentation, appears weak an malnourished, poor skin trigger [*sic*, turgor], which indicates dehydration and then you have that in the setting of an enlarged head circumference. All of the together – the weight was enough to do an admission let alone like all the other concerning stuff. If you have a big head circumference and someone looks weak, one of the possibilities would be some kind of neurologic issue; blockage that's causing more spinal fluid to not drain properly getting a bigger head, trauma would be one of the possibilities but definitely would warrant further evaluation."
(Dr. Mohr, pp. 64:10-65:1).

Q. ...this is an eight nine pound child who's losing roughly a pound, is that correct?

A. Correct, which is alarming because babies are supported to --- so yeah, so if you have a two year old and you have three weeks and they don't gain any weight, that's fine, you'd follow-up. If it's a baby, it's a medical emergency. (Dr. Mohr, p. 65:15-20).

82.   Dr. Mohr further testified that many of the fractures suffered by the minor plaintiff were most likely present during her June 14, 2019 visit to GLBHC. However, Dr. Mohr further testified that the minor plaintiff's subarachnoid brain hemorrhage would have occurred after June 14th due to residual blood in the minor plaintiff's spinal cord fluid. (Dr. Mohr, pp. 65:22-25, 89:6-16).

83.   That Dr. Bernardino and other staff at GLBHC had a mandatory duty to report suspected abuse or neglect of a child under Michigan law, MCL 722.625.

84.   At no time, prior to the minor plaintiff's emergency admission to Covenant Medical Center on June 24, 2019 is there any record that providers or staff at GLBHC contacted Children's Protective Services (CPS) regarding their concerns about her feeding, nourishment or care.

85.   On August 1, 2019, Jennifer A. Lange, at CPS, documented that she received a phone call from Ann Gurnee, RN at GLBHC:

11

"They heard what happened to RRKC as they seen it on the news. They only received one report from U of M on her condition. They did receive the ER report from Covenant. They did not have concerns for abuse or neglect but felt the parents had a lack of understanding of feeding the baby. They had referred them to Infant Mental Health but all attempts to contact the family to get the program started had failed. She was behind in her growth and development. The doctor did not see any visual signs of abuse or neglect. The parents were bringing her in for all her appointments. The parents did not really seem to understand and needed parent education. Dad seemed more receptive to the conversations than mom did when they did interoffice conversations with them."

86.    That following the hearing and a subsequent appeal, the parental rights of Ms. Sarles and Mr. Cantu were terminated due to their abuse and neglect of their daughter. The minor plaintiff was placed into the custody of the State of Michigan Children's Institute.

87.    That on January 11, 2021, Amy Tripp, attorney-at-law, was appointed as Conservator for RRKC for the purpose of pursuing a civil action for medical malpractice and the failure to report the abuse and neglect that allowed catastrophic injury to the minor plaintiff to occur.

88.    That as a direct and proximate result of the abuse and neglect during the first two and a half months of her life, the minor plaintiff is profoundly developmentally delayed.

## COUNT I

## MEDICAL NEGLIGENCE- UNITED STATES OF AMERICA

89.    Plaintiff incorporates by reference the allegations contained in paragraphs1 through 88 of this complaint inclusive as if set forth paragraph by paragraph.

90.    That defendant, United States, by and through its employees, agents and/or ostensible agents, including but not limited to, Dr. Bernardino, owed a duty to the minor plaintiff to adhere to the applicable standards of care for a reasonable physician providing care to a newborn child.

91.    The defendant United States, by and through its employees, agents, and/or ostensible agents, including but not limited to, Dr. Bernardino, further owed a duty to the minor plaintiff to exercise due care and caution and to protect her from abuse by her parents.

92.     That the employees, agents, and/or ostensible agents of defendant United States, including but not limited to, Dr. Bernardino breached the duties he owed to the minor plaintiff, when he failed to:

a)      Timely record a full history of minor plaintiff and/or appreciate significance of same, and proceed as required based on that history;

b)      Timely and appropriately anticipate events and/or complications that can arise for an infant patient with poor weight gain/failure to thrive and malnourishment;

c)      Timely recognize (including via proper testing and/or examination) and/or appreciate the significance of minor plaintiff's condition during well-child checks, her risk factors for suffering malnutrition, child abuse, bruising, fractures, brain injury/encephalopathy and seizure disorder;

d)      Timely and appropriately diagnose and institute a plan of care to treat and manage infant patient's condition(s), including but not limited to poor weight gain/failure to thrive, malnutrition, child abuse, bruising, broken/fractured bones, brain injury/encephalopathy, seizure disorder, including, but not limited to serial weight checks, immediate referral to a hospital for care, reporting to Child Protective Services as required by MCL 722.625;

e)      Perform and/or review a complete physical examination and review all of systems of infant patient at well child checks including, but not limited to, examining for clinical findings of malnutrition, child abuse, brain injury/encephalopathy, including but not limited to, appropriately undressing/unswaddling, noting abnormal weight and head circumference measurements, weak and malnourished appearance, bruising, broken/fractured bones;

f)      Timely and properly advise of follow-up care, treatment, and attention needed for clinical findings of poor weight gain/failure to thrive, malnutrition, child abuse, brain injury/encephalopathy, abnormal weight and head circumference, weak and malnourished appearance, bruising, broken/fractured bones;

g)      Give appropriate infant patient education and discharge instructions as to nutrition, feeding and nourishment;

h)      Promote, advocate, and protect the health, safety, and rights of an infant patient such as the minor plaintiff by reporting her condition to Child Protective Services as required by MCL 722.625;

i)      Refrain from the discharge of an infant patient home until parents demonstrate their ability to feed and safely/appropriately care for infant;

13

j)     Provide proper aftercare and/or not abandon the minor plaintiff, including giving instructions to her parents as to future care that was required;

k)     Timely and appropriately diagnose and recognize that upon observing emergency conditions for an infant patient, such as malnourishment, abnormally low weight, and an abnormally large head circumference, mandates reporting to Child Protective Services pursuant to MCL 722.625 and immediate referral of the infant for proper treatment;

l)     Appropriately, timely and carefully examine, monitor and observe the minor plaintiff for signs and symptoms of poor weight gain/failure to thrive, malnourishment and child abuse, including, but not limited to, abnormal weight and head circumference measurements, weak and malnourished appearance, bruising, broken/fractured bones;

m)     Appropriately and timely monitor vital signs;

n)     Appropriately and timely monitor growth measurements, including weight, height, head circumference;

o)     Perform such appropriate diagnostic testing, including but not limited to imaging of the body and head, labs;

p)     Make timely observations of the minor plaintiff and record these in her medical record, including but not limited to:

      i. growth measurements, including weight, height, head circumference;
      ii. physical examination findings;
      iii. review of systems;
      iv. vital signs;
      v. respiratory findings such as respiratory rate, oxygen saturation;
      vi. labs;
      vii. date and time of medically pertinent events;
      viii. date and time of discussions with providers regarding plan of care.

q)     Refrain from unnecessary delay in providing treatment for malnourishment and injuries resulting from child abuse including but not limited to, referral to a hospital for care, reporting to Child Protective Services as required by MCL 722.625;

r)     Timely request and/or obtain consultation(s)/examination(s) from a neonatologist, pediatrician, and/or hospital;

s)     Timely and appropriately communicate between and among caregivers, including but not limited to, appropriately communicate pertinent findings

14

and abnormalities between and among health caregivers, appropriately utilize the chain of command;

t)  Timely undertake and obtain proper informed consent as to facts, theories, proposed treatment plans, success/failure rates, risks, alternatives, and other pertinent matters;

u)  Timely and appropriately notify caregivers of significant matters and/or adverse changes in infant patient's condition;

v)  Refrain from wrongly furnishing and/or allowing involvement of improper treaters and equipment/facilities, including supervision, instruction and maintenance issues as to all;

w)  Supervise physicians, residents, nurses, medical assistants and staff;

x)  Provide staff in order to ensure that appropriate assessments, care plans, monitoring, treatment, interventions, notifications, and documentation are performed in a timely manner;

y)  Timely provide or request any and all appropriate physician orders necessary to keep the minor plaintiff safe from injury, including but not limited to, those necessary to treat and/or prevent malnourishment, child abuse, broken/fractured bones, and brain injury/encephalopathy/seizure disorder.

z)  Timely and appropriately follow and carry out physician orders;

aa)  Fully follow rules, guidelines, protocols, bylaws, forms, policies, procedures and/or other such items, including prospective defendants' own, and/or promulgate same;

bb)  Comply with applicable statutes and/or regulations and/or other mandates of the State of Michigan or federal government, including, but not limited to the requirement for mandatory reporting of child abuse pursuant to MCL 722.625, MCL 333.21513 et seq., the Michigan Public Health Code, COBRA, and all mandates promulgated thereunder;

cc)  Perform other actions as may be disclosed during discovery.

93.  That the defendant United States is legally responsible for the professional negligence and/or malpractice on the part of its employees, agents, and/or ostensible agents, including, but not limited to, Dr. Bernardino, as set forth herein, pursuant to the doctrines of vicarious liability, *respondeat superior* and/or obstensible agency as defined by *Grewe v. Mt. Clemens General Hospital*, 404 Mich 240, 273 NW2d 429 (1978).

94.    That as a direct and proximate result of the professional negligence and/or malpractice of the employees, agents, and/or ostensible agents of defendant United States, including but not limited to, Dr. Bernardino, the minor plaintiff sustained severe and permanent injuries, including but not limited to:

i.      Severe bodily injury, including brain hemorrhages, lacerations of brain tissue, seizures, and permanent brain injury, retinal hemorrhages in both eyes, numerus fractures of her ribs, legs and arms, malnutrition, muscle wasting, physical impairments, and global developmental delay;

ii.     The need for medical procedures and treatment that would not have been necessary in the absence of professional and/or malpractice, including but not limtied to, intensive care treatment and monitoring, burr hole drainage, optical surgeries, and treatment with anti-epileptic medications;

iii.    Extreme physical pain, suffering and agitation;

iv.     Mental and emotional distress and anguish and loss of life's enjoyment;

v.      The cost of future medical care, rehabilitation expense, nursing expense, special needs, special education as well as other itemizable costs and expenses related to the damages sustained as a result of the professional negligence and/or malpractice on the part of the defendants. This includes expenses incurred in the past and those that will occur in the future;

vi.     Loss of earning capacity on the part of the minor plaintiff;

vii.    Loss of services that the minor plaintiff could have provided and would have provided had these injuries not occurred;

viii.   Permanent inability to make her own independent, responsible life decisions and permanently incapable of independently performing the activities of normal, daily living; and

ix.     Such other injuries and damages which will be determined through the further course of discovery.

16

WHEREFORE, AMY TRIPP Conservator of RRKC, a minor, prays for damages in whatever amount above Seventy-Five Thousand Dollars ($75,000.00) to which she is found to be entitled to at the time of trial, together with interest, costs, and attorney fees, wherefore she brings this suit.

OLSMAN MACKENZIE PEACOCK & WALLACE, P.C.

/s/ Jules B. Olsman
Jules B. Olsman (P28958)
Ronda M. Little (P47236)
Elyse Heid (P80192)
Attorneys for Plaintiff
2684 West Eleven Mile Road
Berkley, MI 48072
248-591-2300 / (248) 591-2304 [fax]

Dated:  December 14, 2021

17

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

AMY TRIPP, Conservator of RRKC, a minor

      Plaintiff,

                                   Case No. 2:21-cv-12859-VAR-PTM

                                   Hon. Victoria A. Roberts

v

UNITED STATES OF AMERICA,

      Defendant.

## FIRST AMENDED AFFIDAVIT OF MERIT OF J. WESLEY COOK, D.O.

STATE OF ILLINOIS          )

                          ) SS

COUNTY OF COOK         )

      This First Amended Affidavit of Merit is being provided to remove the name of the minor Plaintiff, who shall hereinafter be referred to by the initials RRKC.

      I certify that I have reviewed the Notice of Intent to File a Claim pursuant to MCLA 600.2912(b), MSA 27A.2912(2), and all medical records supplied to me by Plaintiffs' attorneys with regard to RRKC, concerning the allegations contained in the Notice. I certify that I am board certified in Family Medicine. I further certify that during the year immediately preceding the date of the occurrence that is the basis for this claim, I devoted a majority of my professional time to the active clinical practice of Family Medicine and/or the instruction of students in an accredited health professional school or clinical research program in Family Medicine.

A.     **The Applicable Standard of Practice or Care**

That the applicable standard of practice or care for the health professionals Great Lakes Bay Health Centers, including Eventure D. Bernardino, MD, or any physicians involved in the care of this matter, was as follows (and included all matters reasonably incident to the following):

1.     timely take a full history of RRKC and/or appreciate significance of same, and proceed as required thereby;

2.     timely and appropriately anticipate events and/or complications that can arise for an infant patient with poor weight gain/failure to thrive and malnourishment;

3.     timely recognize (including via proper testing and/or examining) and/or appreciate the significance of RRKC's condition during well child checks and her risk factors for malnutrition, child abuse, bruising, broken/fractured bones, brain injury/encephalopathy, seizure disorder;

4.     timely and appropriately diagnose and institute a plan of care to treat and manage infant patient's condition(s), including but not limited to poor weight gain/failure to thrive, malnutrition, child abuse, bruising, broken/fractured bones, brain injury/encephalopathy, seizure disorder, including, but not limited to serial weight checks, immediate referral to a hospital for care, reporting to Child Protective Services as required by MCL 722.625;

5.     perform and/or review complete physical examination and review of systems of infant patient at well child checks including, but not limited to, examining for clinical findings of malnutrition, child abuse, brain injury/encephalopathy, including but not limited to, appropriately undressing/unswaddling, noting abnormal weight and head circumference measurements, weak and malnourished appearance, bruising, broken/fractured bones;

6.     timely and properly advise of follow-up care, treatment, and attention needed for clinical findings of poor weight gain/failure to thrive, malnutrition, child abuse, brain injury/encephalopathy, abnormal weight and head circumference, weak and malnourished appearance, bruising, broken/fractured bones;

7.     give appropriate infant patient education and discharge instructions as to nutrition, feeding and nourishment;

8.     promote, advocate, and protect the health, safety, and rights of an infant patient such as RRKC by reporting her condition to Child Protective Services as required by MCL 722.625;

2

9. refrain from discharge of infant patient home until parents demonstrate ability to feed and safely/appropriately care for infant;

10. give proper aftercare and/or not abandon RRKC, including giving instructions as to future care that might be needed;

11. timely and appropriately diagnose and recognize that emergency conditions for an infant patient, such as malnourishment, abnormally low weight, having abnormally large head circumference, requires mandatory reporting to Child Protective Services as required by MCL 722.625 and immediate referral of the infant patient for treatment at a hospital;

12. appropriately, timely and carefully examine, monitor and observe RRKC for signs and symptoms of poor weight gain/failure to thrive, malnourishment and child abuse, including, but not limited to, abnormal weight and head circumference measurements, weak and malnourished appearance, bruising, broken/fractured bones;

13. appropriately and timely monitor vital signs;

14. appropriately and timely monitor growth measurements, including weight, height, head circumference;

15. perform appropriate diagnostic testing, including but not limited to imaging of the body and head, labs;

16. make timely observations of RRKC and record these in her medical record, including but not limited to:

    a. growth measurements, including weight, height, head circumference;
    b. physical examination findings;
    c. review of systems;
    d. vital signs;
    e. respiratory findings such as respiratory rate, oxygen saturation;
    f. labs;
    g. date and time of medically pertinent events;
    h. date and time of discussions with providers regarding plan of care;

17. refrain from unnecessary delay in providing treatment for malnourishment and injuries resulting from child abuse including but not limited to, referral to a hospital for care, reporting to Child Protective Services as required by MCL 722.625;

18. timely request and/or obtain consultation(s)/examination(s) from a neonatologist, pediatrician, and/or hospital;

3

19.   timely and appropriately communicate between and among caregivers, including but not limited to, appropriately communicate pertinent findings and abnormalities between and among health caregivers, appropriately utilize the chain of command;

20.   timely undertake and obtain proper informed consent as to facts, theories, proposed treatment plans, success/failure rates, risks, alternatives, and other pertinent matters;

21.   timely and appropriately notify caregivers of significant matters and/or adverse changes in infant patient's condition;

22.   timely furnish proper treaters and equipment/facilities;

23.   refrain from wrongly furnishing and/or allowing involvement of improper treaters (including staffing/hiring and teaching program issues) and equipment/facilities, including supervision, instruction and maintenance issues as to all;

24.   supervise physicians, residents, nurses, medical assistants and staff;

25.   provide an adequate number of staff in order to ensure that appropriate assessments, care plans, monitoring, treatment, interventions, notifications, and documentation are performed in a timely manner;

26.   timely provide or request any and all appropriate physician orders necessary to keep RRKC safe from injury, including but not limited to, those necessary to treat and/or prevent malnourishment, child abuse, broken/fractured bones, and brain injury/encephalopathy/seizure disorder.

27.   timely and appropriately effect a cure for pain;

28.   timely and appropriately follow and carry out physician orders;

29.   fully follow rules, guidelines, protocols, bylaws, forms, policies, procedures and/or other such items, including prospective defendants' own, and/or promulgate same;

30.   follow the applicable statutes and/or rules and/or regulations and/or other mandates of the State or Michigan or federal government, including, but not limited to the requirement for mandatory reporting of child abuse pursuant to MCL 722.625, MCL 333.21513 et seq., the Michigan Public Health Code, COBRA, and all mandates promulgated thereunder;

31.   perform other actions as may be learned during discovery on this case.

4

**B.** <u>The Applicable Standard of Practice or Care Was Breached</u>

In my opinion the applicable standard of practice or care in this matter was breached by the health care professionals and health care facilities receiving the Notice supplied to me.

**C.** <u>The Actions that Should Have Been Taken or Omitted in Order to have Complied With the Applicable Standard of Practice or Care</u>

The actions that should have been taken or omitted by the health care professionals at Great Lakes Bay Health Centers, including Eventure D. Bernardino, MD, or any physicians involved in the care of this matter, in order to have complied with the applicable standard of practice or care, were as follows (and included all matters reasonably incident to the following):

1. timely take a full history of RRKC and/or appreciate significance of same, and proceed as required thereby;

2. timely and appropriately anticipate events and/or complications that can arise for an infant patient with poor weight gain/failure to thrive and malnourishment;

3. timely recognize (including via proper testing and/or examining) and/or appreciate the significance of RRKC's condition during well child checks and her risk factors for malnutrition, child abuse, bruising, broken/fractured bones, brain injury/encephalopathy, seizure disorder;

4. timely and appropriately diagnose and institute a plan of care to treat and manage infant patient's condition(s), including but not limited to poor weight gain/failure to thrive, malnutrition, child abuse, bruising, broken/fractured bones, brain injury/encephalopathy, seizure disorder, including, but not limited to serial weight checks, immediate referral to a hospital for care, reporting to Child Protective Services as required by MCL 722.625;

5. perform and/or review complete physical examination and review of systems of infant patient at well child checks including, but not limited to, examining for clinical findings of malnutrition, child abuse, brain injury/encephalopathy, including but not limited to, appropriately undressing/unswaddling, noting abnormal weight and head circumference measurements, weak and malnourished appearance, bruising, broken/fractured bones;

6. timely and properly advise of follow-up care, treatment, and attention needed for clinical findings of poor weight gain/failure to thrive, malnutrition, child abuse, brain injury/encephalopathy, abnormal weight and head circumference, weak and malnourished appearance, bruising, broken/fractured bones;

5

7. give appropriate infant patient education and discharge instructions as to nutrition, feeding and nourishment;

8. promote, advocate, and protect the health, safety, and rights of an infant patient such as RRKC by reporting her condition to Child Protective Services as required by MCL 722.625;

9. refrain from discharge of infant patient home until parents demonstrate ability to feed and safely/appropriately care for infant;

10. give proper aftercare and/or not abandon RRKC, including giving instructions as to future care that might be needed;

11. timely and appropriately diagnose and recognize that emergency conditions for an infant patient, such as malnourishment, abnormally low weight, having abnormally large head circumference, requires mandatory reporting to Child Protective Services as required by MCL 722.625 and immediate referral of the infant patient for treatment at a hospital;

12. appropriately, timely and carefully examine, monitor and observe RRKC for signs and symptoms of poor weight gain/failure to thrive, malnourishment and child abuse, including, but not limited to, abnormal weight and head circumference measurements, weak and malnourished appearance, bruising, broken/fractured bones;

13. appropriately and timely monitor vital signs;

14. appropriately and timely monitor growth measurements, including weight, height, head circumference;

15. perform appropriate diagnostic testing, including but not limited to imaging of the body and head, labs;

16. make timely observations of RRKC and record these in her medical record, including but not limited to:

    a. growth measurements, including weight, height, head circumference;
    b. physical examination findings;
    c. review of systems;
    d. vital signs;
    e. respiratory findings such as respiratory rate, oxygen saturation;
    f. labs;
    g. date and time of medically pertinent events;
    h. date and time of discussions with providers regarding plan of care;

17. refrain from unnecessary delay in providing treatment for malnourishment and injuries resulting from child abuse including but not limited to, referral to a hospital for care, reporting to Child Protective Services as required by MCL 722.625;

18. timely request and/or obtain consultation(s)/examination(s) from a neonatologist, pediatrician, and/or hospital;

19. timely and appropriately communicate between and among caregivers, including but not limited to, appropriately communicate pertinent findings and abnormalities between and among health caregivers, appropriately utilize the chain of command;

20. timely undertake and obtain proper informed consent as to facts, theories, proposed treatment plans, success/failure rates, risks, alternatives, and other pertinent matters;

21. timely and appropriately notify caregivers of significant matters and/or adverse changes in infant patient's condition;

22. timely furnish proper treaters and equipment/facilities;

23. refrain from wrongly furnishing and/or allowing involvement of improper treaters (including staffing/hiring and teaching program issues) and equipment/facilities, including supervision, instruction and maintenance issues as to all;

24. supervise physicians, residents, nurses, medical assistants and staff;

25. provide an adequate number of staff in order to ensure that appropriate assessments, care plans, monitoring, treatment, interventions, notifications, and documentation are performed in a timely manner;

26. timely provide or request any and all appropriate physician orders necessary to keep RRKC safe from injury, including but not limited to, those necessary to treat and/or prevent malnourishment, child abuse, broken/fractured bones, and brain injury/encephalopathy/seizure disorder.

27. timely and appropriately effect a cure for pain;

28. timely and appropriately follow and carry out physician orders;

29. fully follow rules, guidelines, protocols, bylaws, forms, policies, procedures and/or other such items, including prospective defendants' own, and/or promulgate same;

7

30.  follow the applicable statutes and/or rules and/or regulations and/or other mandates of the State or Michigan or federal government, including, but not limited to the requirement for mandatory reporting of child abuse pursuant to MCL 722.625, MCL 333.21513 et seq., the Michigan Public Health Code, COBRA, and all mandates promulgated thereunder;

31.  perform other actions as may be learned during discovery on this case.

**D.   The Manner in Which the Breach of the Standard of Practice or Care was a Proximate Cause of the Injury Alleged**

As a result of the above breaches of the standard of practice or care, RRKC sustained preventable malnutrition, muscle wasting, and permanent neurologic and physical injuries from abuse and neglect, including brain and eye hemorrhages, brain injury, encephalopathy, seizure disorder, numerous broken bones, physical impairment and global developmental delays

**E.   Conclusion**

The opinions expressed in this Affidavit are based upon the documents and materials referred to in the paragraphs above, and are subject to modification based upon additional information, which might be provided at some future date.

J. WESLEY COOK, D.O.

Subscribed and sworn to before me this _14_ day of _DECEMBER_ 20_21_

Notary Public
County of _COOK_
State of _ILLINOIS_
My commission expires _04-13-2025_

PATRICIA BRIDGES
Official Seal
Notary Public - State of Illinois
My Commission Expires Apr 13, 2025